**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

SYLVIA ASH,

                  Defendant.

Case No. 1:19-cr-00780-LAK

**SENTENCING MEMORANDUM ON BEHALF OF SYLVIA ASH**

Dated: New York, New York
       April 8, 2022

Respectfully Submitted,

MORRISON & FOERSTER LLP

By: */s/* Carrie H. Cohen
    Carrie H. Cohen
    Nathan D. Reilly
    250 West 55th Street
    New York, NY 10019
    Telephone: (212) 468-8000
    Facsimile: (212) 468-7900
    Email: CCohen@mofo.com
           NReilly@mofo.com

*Counsel for Defendant Sylvia Ash*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ ii

I. THE GUIDELINES ARE UNREASONABLY HIGH AS APPLIED TO MS. ASH ........ 3

    A. Ms. Ash's Base Offense Level Has Been Incorrectly Calculated ......................... 3

    B. Ms. Ash Did Not Employ a "Special Skill" .......................................................... 5

    C. The Guidelines as Applied to Ms. Ash Are Excessive ......................................... 7

II. MS. ASH'S PERSONAL HISTORY AND CHARACTERISTICS ................................. 8

    A. ███████████████████████████████ ............................ 12

    B. Ms. Ash Provides Critical Care and Support to Her Family ............................... 13

    C. Ms. Ash Has Been a Pillar of Her Community .................................................... 17

        i. Ms. Ash Has Been a Role Model for Minority and Female Lawyers ........ 19

        ii. Ms. Ash Has Devoted Herself to Volunteer Work ................................... 21

III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE .................................... 23

    A. Ms. Ash's Conduct Was an Aberration in a Life Dedicated to Public Service .... 23

    B. Ms. Ash's Conduct Did Not Meaningfully Hinder the Prosecution of Wong and His Co-Conspirator ............................................................................................ 24

IV. THE NEED FOR JUST PUNISHMENT, DETERRENCE, SOCIAL PROTECTION, AND REHABILITATION .......................................................................................... 26

    A. Just Punishment Does Not Require an Incarceratory Sentence ........................... 27

    B. A Non-Custodial Sentence Will Achieve the Goals of General and Specific Deterrence ........................................................................................................ 29

    C. Ms. Ash is Not a Threat to Re-Offend ................................................................ 31

    D. § 3553(a)'s Rehabilitative Goals are Best Served by a Non-Custodial Sentence. 33

    E. Need to Avoid Unwarranted Sentencing Disparities ........................................... 36

V. CONCLUSION ......................................................................................................... 3837

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)...................................................................................26, 31

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987)........................................................................................31

*Kimbrough v. United States*,
    552 U.S. 85 (2007)...........................................................................................8

*Nelson v. United States*,
    555 U.S. 350 (2009)..........................................................................................7

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...........................................................18, 29

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) ...........................................................................28

*United States v. Beaufort*,
    No. 13-CR-125, 2014 WL 1278090 (E.D.N.Y. Mar. 19, 2014)..........................30

*United States v. Birkett*,
    No. 99-CR-338-01, 2006 WL 2819663 (S.D.N.Y. Oct. 2, 2006)........................33

*United States v. Booker*,
    543 U.S. 220 (2005)...........................................................................................8

*United States v. Canova*,
    412 F. 3d 331 (2d Cir. 2005)............................................................................19

*United States v. Carmona-Rodriguez*,
    No. 04–CR-667, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)............................32

*United States v. Castellanos*,
    355 F.3d 56 (2d Cir. 2003)........................................................................ 24 fn. 15

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008).........................................................................7, 26

*United States v. Discenza*,
    No. 14-CR-273, 2016 WL 3443586 (S.D.N.Y. May 31, 2016)...........................30

*United States v. Dones*,
No. 19-CR-169, 2022 WL 354679 (S.D.N.Y. Feb. 7, 2022) ...................................13

*United States v. Eberhard*,
No. 03-CR-562-01, 2005 WL 1384038 (S.D.N.Y. June 9, 2005) ...........................32

*United States v. Fritzson*,
979 F.2d 21 (2d. Cir. 1992) .............................................................................5, 7

*United States v. Harris*,
38 F.3d 95 (2d Cir. 1994) ........................................................................................5

*United States v. Hernandez*,
604 F.3d 48 (2d Cir. 2010) ....................................................................................32

*United States v. Joblin*,
112 F.3d 506 (2d Cir. 1997) ....................................................................................5

*United States v. Johnson*,
964 F.2d 124 (2d Cir. 1992) ..................................................................................13

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008) ....................................................................................8

*United States v. Marsh*,
820 F. Supp. 2d 320 (E.D.N.Y. 2011) .............................................................13, 27

*United States v. Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016) ........................................................ 24 fn. 15

*United States v. Prezioso*,
No. 19-CR-157 (S.D.N.Y. 2019) ............................................................................37

*United States v. Rioux*,
97 F.3d 648 (2d Cir. 1996) ....................................................................................19

*United States v. Sampson*,
898 F.3d 287 (2d Cir. 2018) ....................................................................................5

*United States v. Sanchez*,
No. 99-CR-338-12, 2007 WL 60517 (S.D.N.Y. Jan. 8, 2007) ..............................33

*United States v. Stewart*,
590 F.3d 93 (2d Cir. 2009) ......................................................................................7

*United States v. Thavaraja*,
740 F.3d 253 (2d Cir. 2014) ..................................................................................13

*United States v. Weissman*,
   No. 18-CR-524 (E.D.N.Y. 2018) ...........................................................................37

**Statutes**

18 U.S.C. § 3553 .........................................................................................................26

18 U.S.C. § 3553(a) ................................................................................... *passim*

18 U.S.C. § 3553(a)(1).................................................................................................26

18 U.S.C. § 3553(a)(2)....................................................................................2, 11, 26

U.S.S.G. § 5K2.20 ........................................................................................................24

USSG § 2J1.2(c) ................................................................................. 4, 5 fn. 3

USSG § 3B1.3.................................................................................................................5

**Other Authorities**

*Alternative Sentencing in the Federal Criminal Justice System*,
   available at https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/research-projects-and-
   surveys/alternatives/20090206_Alternatives.pdf (last visited Mar. 29, 2022) ........................36

Anthony N. Doob & Cheryl Marie Webster,
   *Sentence Severity and Crime: Accepting the Null Hypothesis*..............................................30

*Measuring Recidivism: The Criminal History Computation of the Federal
   Sentencing Guidelines*,
   available at https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/research-
   publications/2004/200405_Recidivism_Criminal_History.pdf (last visited
   Mar. 29, 2022).................................................................................................................33

Report on the U.S. Sentencing Commission's Legislative Mandate,
   available at https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/research-
   publications/2004/200405_Recidivism_First_Offender.pdf (last visited Mar.
   29, 2022) .........................................................................................................................32

Richard S. Frase, Punishment Purposes,
   58 Stan. L. Rev. 67 (2005).............................................................................................30

*Statistical Information Packet: Fiscal Year 2020*,
 available at https://www.ussc.gov/sites/default/files/pdf/research-and-
 publications/federal-sentencing-statistics/state-district-circuit/2020/2c20.pdf
 (last visited Mar. 29, 2022).................................................................................................36

**SENTENCING MEMORANDUM ON BEHALF OF SYLVIA ASH**

This Sentencing Memorandum and the attached letters respectfully are submitted on behalf of defendant Sylvia Ash in advance of the sentencing hearing scheduled for April 20, 2022 at 3:00 p.m.  For the reasons set forth below, Ms. Ash respectfully requests that the Court impose a sentence of time served, three years' supervised release, with conditions of substantial community service and continued mental health treatment.

Ms. Ash comes before this Court as a broken woman, professionally, mentally, and physically.  As an immigrant and woman of color, she was the first in her family to attend college and overcame countless barriers to become a lawyer who then served for more than twenty years as an advocate for city workers.  When she became a judge, she continued to serve her community by remaining active in a number of organizations that address issues facing immigrants and minorities in New York City, acting as a mentor to countless young attorneys, and being actively involved in the broader legal community.

Now, having resigned from the bar and the bench, she no longer will be a part of the profession that has defined her adult life and been an integral part of her identity.  The reputation and good name that she spent a lifetime building is in tatters and, at age 64, the past few years have brought ██████████████████████████████  But, throughout it all, she has continued to serve the critical roles of legal guardian and "mother" to her ██████████ brother and caretaker to her 77-year-old aunt, ██████████████, as well as, in recent months, ██████████████████████████████████.  Without minimizing the obstruction crimes for which Ms. Ash was found guilty and taking full responsibility for her conduct, incarceration here is inappropriate, while a non-custodial sentence with substantial community service will permit her to continue to take care of her dependent

family members and her own health and allow her to continue to contribute positively to the underserved and disadvantaged communities she has spent a lifetime serving.

The United States Probation Department ("Probation") calculates Ms. Ash's recommended sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "USSG") as 46 to 57 months' imprisonment (Presentence Investigation Report (the "Presentence Report" or "PSR") ¶ 28) (ECF No. 169).[1]  Such calculation, however, incorrectly attributes the full extent of Kam Wong's ("Wong") embezzlement to Ms. Ash and includes an unwarranted sentencing enhancement for alleged use of a special skill and thus, as more fully explained below, her Guidelines range instead should be 30 to 37 months' imprisonment.  But, even applying Probation's incorrect Guidelines calculation, Probation still recognizes that a sentence well below the advisory Guidelines range is appropriate in this matter, recommending a sentence of 12 months' incarceration to be followed by one year of supervised release.  (PSR at 42.)

While Ms. Ash agrees with Probation's assessment that a below-Guidelines sentence is appropriate, she respectfully submits that a non-custodial sentence would be sufficient, but not greater than necessary, to fulfill the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).  Ms. Ash's request for a non-custodial sentence is not made lightly.  As outlined in greater detail below, a term of supervised release would permit Ms. Ash to continue to provide necessary care for her profoundly disabled younger brother, care that she is uniquely positioned to offer because of her lengthy history of caring for him for the last 27 years.  A non-custodial sentence would also ensure that Ms. Ash could continue to address her own physical and mental health issues as well as care for her aunt, who is again undergoing chemotherapy, and the father of her son, who

---

[1]  As set forth below, Ms. Ash disputes the Guidelines calculation set forth in the PSR.

recently suffered a debilitating stroke.  Further, as demonstrated by the almost 70 letters of support sent to the Court on Ms. Ash's behalf, Ms. Ash has been a positive force in her community and would be able to continue to provide vital support to so many in need if the Court imposed a sentence that did not remove Ms. Ash from the community and place her in a correctional facility.

Importantly, the goals of sentencing set forth in 18 U.S.C. § 3553(a) can be achieved with a non-custodial sentence.  As described above, the significant medical needs of Ms. Ash and her family recommend against incarceration.  Further, Ms. Ash's professional life is in ruin and she has been publicly humiliated.  Accordingly, both specific and general deterrence goals already have been satisfied.  Ms. Ash also has led a law-abiding life and has no association with the individuals or entities at the core of the government's larger investigation, such that an incarceratory sentence is unnecessary to promote specific deterrence or to protect the community.  In short, the goals of sentencing could and would be best met by the imposition of a non-custodial sentence with substantial community service.

## I.     THE GUIDELINES ARE UNREASONABLY HIGH AS APPLIED TO MS. ASH

The Presentence Report estimates Ms. Ash's total offense level to be 23.  (PSR ¶ 130.) Accordingly, as Ms. Ash has no prior criminal history and falls within Criminal History Category I, the Presentence Report calculates the applicable advisory Guidelines range as 46 to 57 months' incarceration.  (*Id.*)  As set forth in her objections to the Presentence Report, Ms. Ash believes this calculation is in error.

### A.     Ms. Ash's Base Offense Level Has Been Incorrectly Calculated

The Presentence Report calculates the base offense level to be 21, (PSR ¶ 89), based on assumptions that are inconsistent with the record at trial.  More specifically, the Presentence Report indicates that Ms. Ash "is being held accountable for obstructing justice into the

Government's investigation into embezzlement from Municipal Credit Union [the "MCU"] with a loss which was known to the defendant, or should have been known, of substantially more than $3,700,000, which reflects the amount that Wong embezzled as supposed long-term disability offset payments as well as taxes that he had MCU pay on that amount."  (PSR ¶ 78.)  As a result, the Presentence Report reflects the application of USSG § 2J1.2(c), which requires the calculation of a base offense level by determining the offense level of the obstructed investigation or prosecution (here, the embezzlement scheme conducted by Wong) and then applying a six-level reduction pursuant to § 2X3.1(a)(1).  (PSR ¶ 84.)  The Presentence Report concludes that the resulting offense level of 21, calculated pursuant to § 2J1.2(c), (PSR ¶ 89), is greater than the offense level of 19 that would otherwise be calculated under § 2J1.2(b).  (PSR ¶ 84 and n.8.)

Yet, it was undisputed at trial that Ms. Ash had no knowledge of Wong's embezzlement scheme.  She was never charged with embezzlement and the government did not present any evidence at trial, as there was none, that Ms. Ash knew of Wong's theft from the MCU.[2]  To the extent that the Presentence Report premises Ms. Ash's actual or imputed knowledge of Wong's theft on her signature, at Wong's urging, of a memorandum on dated January 22, 2018 (the "January Memorandum") and the reference therein to approximately $3.7 million, such reliance is misplaced as the jury acquitted her on the Count in the Indictment relating to that allegation. Accordingly, Ms. Ash submits that the Presentence Report's calculation set forth in Paragraphs

---

[2] As an explanation for declining to amend its calculation of Ms. Ash's base offense level, the Presentence Report states that "the record of trial supports that the defendant knew or should have known that Wong had embezzled at least $3.7 million from MCU."  (PSR at 37.)  The Presentence Report, however, does not identify any cite to the trial record to support this conclusion and, in fact, the government presented no such evidence and never made any such argument at trial as there would have been no evidence to support it.

84 through 89 are in error and that her base offense level should instead be calculated as level 19

(as opposed to level 21), as contemplated by footnote 8 of the Presentence Report.[3]

B.     **Ms. Ash Did Not Employ a "Special Skill"**

Ms. Ash also objects to the Presentence Report's conclusion that Ms. Ash used "a special

skill in a manner that significantly facilitated the commission of the offenses, specifically, her

knowledge and experience with attorney-client privilege and the role of a general counsel," (PSR

¶ 78), which resulted in two-offense level enhancement pursuant to USSG § 3B1.3.  (PSR ¶ 91.)

Here, Ms. Ash employed no "special skill" in connection with the Counts of conviction.

Application Note 4 to USSG § 3B1.3 defines "special skill" as a "skill not possessed by

members of the general public and usually requiring substantial education, training or licensing.

Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."

In determining whether an individual's use of a "special skill" "significantly facilitated the

commission of the offenses," the court must consider whether the special skill(s) "increase[d] the

chances of succeeding or avoiding detection."  *United States v. Sampson*, 898 F.3d 287, 313 (2d

Cir. 2018) (*citing United States v. Fritzson*, 979 F.2d 21, 22 (2d. Cir. 1992)).  In the case of

lawyers, courts have applied the sentencing enhancement based not merely on a defendant's

status as a lawyer, but on their use of specialized legal skills.  *See, e.g., United States v. Harris*,

38 F.3d 95, 99 (2d Cir. 1994) ("[t]he adjustment is grounded not on [defendant's] holding

himself out as an attorney, but on the use of skills"); *United States v. Joblin*, 112 F.3d 506, 506

(2d. Cir. 1997) (holding that the imposition of the sentencing enhancement was appropriate

where the district court found that "the fact that [defendant] was skilled as a lawyer, permitted

---

[3] Footnote 8 to the Presentence Report sets forth the offense level that would apply pursuant to USSG §2J1.2(b) if, as Ms. Ash submits, USSG § 2J1.2(c) does not apply.

him to conduct himself in a way that, because of the lack of that skill on the part of others, permitted the offense to be committed, and concealed the fact that it was being committed").

Here, neither the offensive conduct as set forth in the Presentence Report, nor any evidence at trial, reflect any effort by Ms. Ash to use her legal skills to "significantly facilitate" the commission of the offenses of conviction.  There are no factual averments in the Presentence Report and there was no evidence presented at trial that Ms. Ash's knowledge of the "attorney client privilege," (PSR ¶ 78), was relevant to the crimes with which she was charged and ultimately convicted.[4]

To the extent the special skills enhancement is premised on Ms. Ash's knowledge of "the role of a general counsel" as a "special skill," (*id.*), it appears to relate to the conduct set forth in Paragraphs 57 and 72 of the Presentence Report, respectively.[5]  But again, the conduct described in those paragraphs do not reflect Ms. Ash's use of any "special skill," let alone one that

---

[4] The Presentence Report again concludes that "the trial record supports that the defendant relied on her training and experience as a lawyer to enhance her chances of successfully obstructing the federal investigation of Wong and herself,"  (PSR at 38), but offers no trial transcript or exhibit cite and the trial record does not support this conclusion.

[5] Paragraph 57 of the Presentence Report states as follows:

> ASH falsely stated that Thomas Siciliano, MCU's then-General Counsel, had informed her that Wong had the option under his employment contract to receive money himself in order to obtain LTD insurance instead of having the Credit Union purchase LTD insurance for Wong, although Siciliano did not consider that approach advisable. In truth, Siciliano had never discussed with ASH whether Wong could receive money instead of long-term disability insurance.

Similarly, Paragraph 72 of the Presentence Report states as follows:

> ASH claimed that after she became Chair, she discussed with the then-General Counsel, Thomas Siciliano, Wong's interest in receiving monetary payments in lieu of the LTD insurance policy, and Siciliano advised that it was permissible for Wong to do so, but Siciliano advised against it (when in truth, ASH did not discuss with Siciliano that Wong was considering receiving payments in lieu of obtaining an LTD insurance policy nor did Siciliano tell ASH that it was permissible but not advisable for Wong to receive such payments, as ASH claimed).

increased her "chances of succeeding."[6] *Fritzson*, 979 F.2d at 22.  No "special skill" is required to know that an entity's general counsel could advise on an executive's employment contract. Nor did Ms. Ash's knowledge of a general counsel's role increase the chance that her purportedly false statements would "avoid[] detection." *Id.*  Ms. Ash does not contend, as the government suggests, that the enhancement does not apply because a "layperson" could have engaged in similar conduct.  (PSR at 38.)  Rather, the enhancement should not apply because Ms. Ash's conduct does not reflect her use of any specialized knowledge or expertise with respect to the law or the legal system.[7]

As a result, based on her objection to the calculation of the base offense level as set forth in Section I.A, *supra*, and to the application of the "special skills" enhancement, Ms. Ash submits that the applicable total offense level is 19 with a corresponding advisory Guidelines range of 30 to 37 months' imprisonment, given her Category I Criminal History.[8]

### C.    The Guidelines as Applied to Ms. Ash Are Excessive

It is well-settled law that the Guidelines "are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (confirming that district courts no longer presume the Guidelines range of sentences to be reasonable); *United States v. Stewart,* 590 F.3d 93, 143 (2d Cir. 2009) (explaining that "a sentence outside the Guidelines carries no presumption of unreasonableness" and the Guidelines "are only one of the

---

[6]  As the Court is aware, Ms. Ash was acquitted at trial on Count Two of the Superseding Indictment, which alleged that she had sought to obstruct justice by signing the false January Memorandum.  To the extent the "special skills" enhancement is premised on this acquitted conduct, the Court should decline to apply it.

[7]  Far from reflecting any "special skill," Ms. Ash's failure to produce certain emails and text messages (and the deletion of certain materials), coupled with her statements to the government, do not reflect intricate planning or any considered legal (or technical) expertise.

[8]  If only Ms. Ash's objection to the two-level "special skill" enhancement is adopted, her total offense level would be 21, and Ms. Ash's Guidelines range would be 37 to 46 months' imprisonment (assuming a Category I Criminal History).  Such a Guidelines range would still be excessive for the reasons explained herein.

factors to consider" when imposing a sentence) (internal citations and quotation marks omitted).

District courts have wide discretion to impose non-Guidelines sentences, so long as they are

within the range of reasonable sentences.  *See United States v. Booker*, 543 U.S. 220, 226-27

(2005).  District Judges enjoy "considerable discretion in identifying the grounds that can justify

a non-Guidelines sentence."  *United States v. Jones,* 531 F.3d 163, 172 (2d Cir. 2008).  The

Guidelines calculations are merely one factor to consider and should not be given greater weight

than any of the other factors.  *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007).

Here, whether the Presentence Report correctly calculated the advisory Guidelines

applicable to Ms. Ash's conduct – which it does not – or Ms. Ash's calculation is correct, the

Guidelines as applied to Ms. Ash are patently unreasonable.  As discussed above, Ms. Ash was

not a participant in, nor a beneficiary of, Wong's embezzlement scheme.  Whether the applicable

estimated range of incarceration is 46 to 57 months (as the government contends) or 30 to 37

months (as Ms. Ash argues above), such lengthy custodial sentencing ranges are not reasonable

when considered in the light of the 66-month sentence Wong received for stealing roughly $10

million and the 27-month sentence that Wong's co-conspirator, Joseph Guagliardo

("Guagliardo") received after stealing hundreds of thousands of dollars.  Here, the Guidelines as

applied to Ms. Ash simply are unreasonably high.

## II.    MS. ASH'S PERSONAL HISTORY AND CHARACTERISTICS

Ms. Ash was born in Trinidad and came to the United States, by way of London,

England, when she was 16 years old.  (PSR ¶¶ 105-07.)  Her mother and father, both deceased,

worked as a healthcare provider and electrician, respectively.  (PSR ¶ 105.)  Ms. Ash finished

high school in Brooklyn and went on to graduate from John Jay College in 1976 and Stony

Brook University in 1978, working in a morgue during her college summers to help put herself

through school.  (PSR ¶¶ 107, 121.)  Aside from her sister who completed a nursing degree, Ms.

Ash is the only one of her siblings to have completed college.  (A. Ghaffaar Letter, Ex. A-7, at 3.)[9]

After college, Ms. Ash continued to persevere and chart her own course, attending and graduating from Howard University Law School in 1984.  (PSR ¶ 107.)  Upon graduation from law school, she embarked on what would become a career dedicated to public service.  She served as a law clerk in New Jersey, (PSR ¶ 120),  after which she became a staff attorney for District Council 37 ("DC 37"), New York City's largest municipal union, where she served its members and the community for 20 years.  (PSR ¶ 119.)  While at DC 37, Ms. Ash worked in the Family Law Unit and co-founded the union's Immigration Program, which she established to assist non-citizen DC 37 members and their families to obtain United States citizenship.  (Attorney R. Chappell Letter, Ex. C-5, at 1.)  Through Ms. Ash's diligence, in the program's first year alone, more than 300 DC 37 members obtained citizenship.  (*Id.*)  Ms. Ash also acted as a Victims Rights Liaison at DC 37, counseling battered and abused women and children, and was a member of the Fathers' Rights Group, providing critical advice to non-custodial fathers on how to maintain a relationship with their minor children.  (*Id.*)

Ms. Ash resigned from her position at DC 37 to run for judicial office, winning election in Brooklyn to a position on the civil court.  (PSR ¶ 118.)  She served in that position until her 2010 election to serve as Justice of the Supreme Court in Kings County.  (*Id*.)  Ms. Ash continued in that position until her resignation from the bench on March 15, 2022.  As set forth below and in the many letters submitted to the Court on her behalf, Ms. Ash's public service has not been limited to her compensated positions at DC 37 and on the bench.

---

[9] For ease of reference, the letters submitted on Ms. Ash's behalf have been grouped by the relationship of each sender to Ms. Ash followed by a number, *e.g.*, A-1, B-1, C-1.  Exhibits labelled with an "A" are from family member or relate to family members; "B" are from members of the clergy; "C" are from attorneys and judges; and "D" are from friends and associates.

Ms. Ash has served as a mentor and role model to many first-generation attorneys, particularly women of color, and taken an active role in numerous professional organizations and non-profit entities that help traditionally disadvantaged individuals.  Specifically, Ms. Ash has volunteered with and devoted her time to the following organizations, among others:

- Brooklyn Women's Bar Association ("BWBA") (serving as member of the Board of Directors)
- Columbian Lawyers Association
- Holy Trinity Ministry, Brooklyn, New York (serving as Youth Ministry Instructor)
- Howard University School of Law Alumni Association
- Judicial Friends (serving as member of the Board of Directors)
- Judges and Lawyers Breast Cancer Alert (serving as member of Board of Directors)
- Nathan R. Sobel-Kings County American Inns of Court (serving as Master)
- St. Gabriel's Senior Citizens' Center (serving as member of the Board of Directors)
- National Association for the Advancement of Colored People ("NAACP") – New York City Chapter  (serving as pro bono counsel)
- New York Urban League (serving as member of the Board of Directors)
- Q'Kingdom Ministries (serving as member of the Board of Directors)

(PSR ¶ 122.)[10]

The letters of support that this Court has received on Ms. Ash's behalf make plain that her involvement in these organizations was substantial and that she was actively engaged in their activities and her community in order to improve the lives of those around her.  In this regard, a letter from the Pastoral Committee at the Holy Trinity Ministry Church offers insight into exactly how engaged Ms. Ash is on behalf of others.  Specifically, the Pastoral Committee notes that she provided congregants with "marital counseling, matrimonial counseling and legal assistance at no cost" and also assisted immigrants in the church in interfacing with government entities.  The

---

[10]  *See also* Attorney M. Schwartz Letter, Ex. C-16; Attorney H. Blank Letter, Ex. C-3, at 1, R. Burke Letter, Ex. D-5, at 2; Attorney M. Mirman Letter, Ex. C-11, at 1; Attorney M. Steinhardt Letter, Ex. C-20, at 1; Attorney S. Bamundo Letter, Ex. C-2, at 1; Attorney A. Moreno Letter, Ex. C-12, at 1; Attorney G. Brown Letter, Ex. C-4, at 1; and New York State Democratic Committeeman J. Gold Letter, Ex. D-14.

Pastoral Committee noted specific families by name that Ms. Ash assisted in petitioning to change their immigration status.  (Pastoral Committee Letter, Ex. B-4, at 1.)

As her friend and former DC 37 intern Sharon Toussaint succinctly states, Ms. Ash is "so much more than the sum of the crimes" for which she was convicted.  (Attorney S. Toussaint Letter, Ex. C-22.)  Ms. Ash comes from humble beginnings and, through sheer force of will and hard work, became an attorney and judge who on her own raised a successful and similarly public service oriented son, Qassim Ashton Ghaffaar ("Ashton"), a Los Angeles firefighter.  She continues to be a caregiver for her ████████████ brother and her aunt, who is ████████████ as well as, most recently the 71-year-old father of her son, and has done so while simultaneously serving her community in numerous ways.  Ms. Ash's friends, family, and colleagues emphasize the significant amount of good she has done and continues to do for those around her, particularly with respect to those in the community who are often underrepresented.  Her friends and family note the serious void in her family's life, and in the community more generally, that would be left were Ms. Ash to be incarcerated for any period of time.

These views, expressed time and again in the letters of support the Court has received, and described at greater length below, demonstrate that a non-custodial sentence would be sufficient to meet the goals of sentencing, set forth in 18 U.S.C. § 3553(a)(2), to (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

**A.** ██████████████████████████████████

Ms. Ash is a 64-year-old woman who has faced significant ████████████████

challenges in recent years.  Any period of incarceration is sure to exacerbate these issues and

perhaps cause Ms. Ash to further deteriorate.



███████████████████████████████████████████████████

**B.      Ms. Ash Provides Critical Care and Support to Her Family**

It is well-established that an individual's family circumstances are appropriately considered by courts in imposing sentences and often are a factor in the imposition of a non-custodial and/or below-Guidelines sentence.  *United States v. Thavaraja,* 740 F.3d 253, 262 (2d Cir. 2014) (affirming the district court's consideration of a defendant's family circumstances in imposing sentence); *United States v. Johnson*, 964 F.2d 124, 129, 130 (2d Cir. 1992) (affirming district court's consideration of defendant's role as a caregiver to young children in imposing sentence); *United States v. Marsh,* 820 F. Supp. 2d 320, 360 (E.D.N.Y. 2011) (imposing a well-below Guidelines sentence because, in part, the defendant was "dedicated to his wife, children and extended family"); *see also United States v. Dones*, No. 19-CR-169, 2022 WL 354679, at *3 (S.D.N.Y. Feb. 7, 2022) (granting compassionate release based on extraordinary circumstances relating to defendant's role as the "only adequate familial caregiver").

Here, Ms. Ash's extraordinary family responsibilities and circumstances are factors that strongly support the imposition of a non-Guidelines sentence.  As described below, Ms. Ash is

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

Ms. Ash raised her only son, Ashton, as a single working mother.  While he is now 30-years-old and working in Los Angeles, California as a firefighter, Ms. Ash is the legal guardian

13







There is no doubt that family members often are "collateral damage" when any individual comes into contact with the criminal justice system.  But here, Ms. Ash's role ████████ ████████████████████████████████████████████████████████████████ ████████████████████, constitute extraordinary circumstances that strongly counsel against the imposition of an incarceratory sentence.  This is particularly true where, as set forth below, the other goals of sentencing can be met without the imposition of a prison term.

### C.      Ms. Ash Has Been a Pillar of Her Community

Ms. Ash is well-recognized by her peers as "the foundation on which many families and members of the community stand on in times of need." (Professor C. Sterling-Fox Letter, Ex. A-9.)  Her contributions to her community are numerous and examples from letters submitted to the Court are highlighted below:

- Ms. Ash "has generously shared of her time and resources [with our congregation] whenever I sought her assistance."  (Bishop H. Nelson Letter, Ex. B-5, at 2.)

- Ms. Ash "has helped so many people through her good deeds, charitable endeavors, and voluntary service. She has served on so many committees and associations giving the gift of her time, her talent and experience as well as her unique ability to teach."  (Attorney M. Shpelfogel, Ex. C-19, at 2.)

- "Long before I met Sylvia Ash, I heard about her and her many involvements in Churches and civic organizations in making Brooklyn a better place to live."  (Hon. A. Fisher Rubin Letter, Ex. C-8.)

- "As a Director of St. Gabriel's Senior Center, Sylvia fought the "good fight." She secured the funding and resources necessary to enhance the Center and the quality of life for those who attend."  (New York State Democratic Committeeman J. Gold Letter, Ex. D-14.)

- "Judge Ash has been a steadfast pillar in the community at large. She runs the gamut in helping with community services."  (V. Findlay Letter, Ex. D-13, at 1.)

- Ms. Ash "encouraged and helped the younger members of the Board [of the BWBA] gain confidence under her watchful eye … there is no doubt that without Justice Ash's guidance and input, the BWBA would not have been as dynamic and successful." (Attorney M. Wachsman Letter, Ex. C-23, at 2.)

- "Over the years, I stood in awe as Judge Ash worked the rooms in spaces like the Brooklyn Women's Bar Association and the Brooklyn Bar Association but I marveled at how she also found time to stay committed to the communities that she came from by joining the prestigious Church Women United organization. She was a regular at the NAACP and AARP and was known for offering her pro bono legal services and sage advice to these historical organizations." (Former New York City Council Majority Leader L. Cumbo Letter, Ex. D-11, at 1.)

- "To expand the reach of our Caribbean Heritage Month celebrations, Sylvia … decided to create a similar celebration for the legal community … This event required a lot of work, which she undertook selflessly year after year." (H. Ali Letter, Ex. D-2.)

- "Ms. Ash has been a great asset to the [West Indian] community. She has been volunteering and supporting the community in areas such as immigration and citizen services, mentoring young girls and boys and other community activities for many years" (Professor I. Pierce Letter, Ex. D-20.)

- Ms. Ash always demonstrated a "willingness to attend impromptu community group meetings to explore beneficial youth services offered to neighborhood groups and financial donations to support Holiday Programs and Back to School Supplies for our low income youth." (J. Alexander Letter, Ex. D-1.)

- Ms. Ash was "involved in the Brooklyn Bar Association, the Brooklyn Women's Bar Association and many of their programs and CLEs" as well as "the Metropolitan Black Bar Association" and "participated in many public middle and high school programs, encouraging and speaking to students during career days to inspire students to succeed, just like her." (Attorney S. Bamundo Letter, Ex. C-2, at 1.)

A non-custodial sentence will enable Ms. Ash to continue to engage in these good works and benefit the community more broadly. Her continued engagement in mentoring young people and in her church's charitable ministries, for example, will be of far greater benefit to the community than placing her in a custodial setting.

Courts have repeatedly recognized that a defendant's charitable acts and philanthropy can be considered in imposing sentence. *See, e.g., United States v. Adelson,* 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (citing a character reference indicating that the defendant was the type of person "who we know we can rely on to be there for us no matter what we might need," noting the defendant's "numerous acts of compassion and generosity that date back to the defendant's childhood and have continued to the present" and, more generally, defendant's history of

philanthropy in imposing a 42-month sentence for a defendant's whose Guidelines were life in prison); *see also United States v. Canova*, 412 F. 3d 331, 358 (2d Cir. 2005) (holding district court did not abuse its discretion in granting a substantial downward departure based on defendant's extraordinary history of public service)*; United States v. Rioux,* 97 F.3d 648, 663 (2d Cir. 1996) (considering defendant's participation in charitable fundraising).

       i.     <u>Ms. Ash Has Been a Role Model for Minority and Female Lawyers</u>

Ms. Ash has been and remains particularly passionate about mentoring youth, particularly those from communities of color, immigrant communities, and economically disadvantaged backgrounds as well as young women. Part of Ms. Ash's passion for mentorship stems from her own experiences in overcoming significant barriers to entry into the legal profession. Her friend and former colleague from the BWBA Helene Blank, recalls when Ms. Ash spoke on a panel for the New York State Academy of Trial Lawyers about the challenges of implicit bias:

> She jumped at the chance to participate and tell a packed audience about her life experiences. Her recounting of the barriers she was met with as an attorney in court was riveting. I remember her of telling how more than one Court Officer refused to allow her to walk into the well area, because she could not possibly have been anyone's attorney and how these experiences made her make sure that no such thing would ever happen to anyone in her court.

(Attorney H. Blank Letter, Ex. C-3, at 2.) Indeed, Ms. Ash wanted "students of all ages to believe that there was a realistic path that they could follow to become a lawyer or a judge." (Attorney A. Moreno Letter, Ex. C-12, at 2.) At the high school level, Ms. Ash was always thrilled to volunteer at annual career days to "inspire students to succeed, just like her." (Attorney S. Cohn Letter, Ex. C-7, at 2.) She also took pride in participating in the annual summer youth employment programs at the Supreme Court in Kings County. (R. Randall Letter, Ex. D-23.) Ms. Ash also supported young attorneys with whom she crossed paths. (Attorney C. Shaw-Brewer Letter, Ex. C-18.)

Abdul Lloyd-Bey, one of her mentees, credits much of his advancement in his legal career to Ms. Ash's guidance.  As a young attorney from an impoverished family, he did not have access to people in the legal profession that he could "call on for guidance and direction." (Attorney A. Lloyd-Bey Letter, Ex. C-10, at 1.)  He subsequently met Ms. Ash who, despite being "very busy with courtroom proceedings, hearings and trials … always found time" to chat, sometimes for hours on end.  (*Id.*)  Joam Alisme, another mentee, similarly thanks Ms. Ash's guidance "for laying the foundation of [his] … legal career."  (Attorney J. Alisme Letter, Ex. C-1, at 1.) Ms. Ash likewise "dedicated countless hours" to teaching 'Cil Shaw-Brewer, a former colleague at DC 37, about trial work so that she could "be the best attorney" possible.  (Attorney C. Shaw-Brewer Letter, Ex. C-18.)

This dedication and passion also was evident in Ms. Ash's work on the bench.[12]  Upon learning of her upcoming sentencing, Daniel Kornstein, a partner at Emery Celli Brinkerhoff Abady Ward & Maazel LLP, wrote a letter of support for Ms. Ash.  (Letter of Attorney D. Kornstein, Ex. C-9.)  He noted that while he did not know Ms. Ash personally, he had appeared before her as a litigant in 2019.  He described how Ms. Ash spent hours to "patiently and skillfully" overcome the ill-will between the parties and conducted a mediation of the sort that he had never seen a trial judge perform in his nearly fifty years as an attorney.  (*Id.* at 1-2.)  He summarizes the experience: "Judge Ash's beneficial performance in that case brought credit on the judiciary and won the long lived respect of my clients and myself."  (*Id.* at 2.)  Attorney Anthony Ricco similarly notes that as a "member of the African American Bar," he is "aware of

---

[12] Despite Probation's inclusion of inappropriate and unverified information in the Presentence Report, (PSR ¶19), as the Court repeatedly informed the jury at trial, this case was not about Ms. Ash's conduct on the bench.  There were no allegations and certainly no evidence of any corruption related to her judicial duties.  At trial, for instance, Robert Tembeckjian, the Administrator and Counsel at the New York State Commission on Judicial Conduct, testified that at no time did he or his investigators identify any instance in which Ms. Ash presided over matters involving the MCU.  (Trial Transcript at 633:21-24.)

former Judge Sylvia Ash's professional reputation as a bright, intelligent and compassionate jurist" and someone who "enjoyed a stellar reputation for always seeking to promote fairness to all parties and litigants" and for "conducting herself with the dignity and grace commensurate with her role as jurist." (Attorney A. Ricco Letter, Ex. C-15, at 1)

Ms. Ash "has similarly assisted countless other people," (Attorney C. Shaw-Brewer Letter, Ex. C-18), and in doing so has had a profound impact on the lives of many. Her cousin Faustina Ash points to Ms. Ash's "cheerful comments and sound advice" as proving "that it was possible for me – as a young black female – to achieve and succeed at a time when there were few public examples or role models." (F. Ash Letter, Ex. A-1, at 2.) Angélicque Moreno, the first person of Puerto Rican descent and the second woman to become the President of the New York State Academy of Trial Lawyers, identifies Ms. Ash's "example and encouragement" as leading her to seek leadership positions and attempt positive change in the legal community. (Attorney A. Moreno Letter, Ex. C-12, at 2.) Throughout her career, Ms. Ash was not only a role model, but also an enthusiastic mentor and supporter for individuals who might otherwise have given up on their dream of having a career in the law. While she no longer will be a member of the legal profession, a non-custodial sentence will permit her to continue to mentor young attorneys and professionals in a variety of other ways.

      ii.    <u>Ms. Ash Has Devoted Herself to Volunteer Work</u>

Despite her full-time legal career and her family commitments as a single mother and caregiver for Keith, Ms. Ash has been generous with her time in multiple volunteer efforts. Leslie Wade, one of her friends from Howard University, recalls being "truly flummoxed" at how Ms. Ash "found the time to be involved in so many community activities." (L. Wade Letter, Ex. D-30.) Ms. Ash's volunteer efforts were varied and extensive: she provided pro bono legal services in areas including immigration advice and served as pro bono counsel for the

New York branch of the NAACP, (Attorney G. Brown Letter, Ex. C-4 at 1), read books to children in support of the "Read Across America" campaign, (Attorney A. Moreno Letter, Ex. C-12, at 1), served as a master at the Nathan Sobel Inns of Court in Brooklyn and organized celebrations for Caribbean Heritage Month, (H. Ali Letter, Ex. D-1), as well as Women's History Month, (H. Blank Letter, Ex. C-3), and Black History Month.  (Attorney S. Bamundo Letter, Ex. C-2, at 1.)  She was active in the fight against breast cancer as part of the Lawyers and Judges Breast Cancer Alert.  (Attorney M. Steinhardt Letter, Ex. C-20.)  She also served on the Board of Directors of the BWBA, from which she received the Lifetime Achievement Award for her contributions.  (L. Clarke Letter, Ex.D-7.)  In addition, she was an active member of the Brooklyn Bar Association, from which she received the Award for Recognition of Outstanding Achievement in the Science of Jurisprudence and Public Service.  (I. Shaw Letter, Ex. D-27, at 1.)

Ms. Ash was particularly attuned to the need of those "who did not have the ability to speak for themselves."  (New York State Democratic Committeeman J. Gold Letter, Ex. D-14.) She expressed "humility and genuine concern for those trapped in the cycle of poverty" and would often "take time out of her busy schedule to volunteer [with the food program] at the Hope Center Development Corporation."  (Bishop H. Nelson Letter, Ex. B-5, at 1.)  Moreover, Ms. Ash was passionate about assisting the elderly and "believed that in their glory years … [they] should be treasured and appreciated."  (Rev. E. Alleyne Letter, Ex. B-1)  She has volunteered at the Seniors Center at St. Gabriel's Episcopal Church for more than 15 years and also served on its Board of Directors.  Ms. Ash "would often be found at all of their events, whether it be church services or activities and some days would just drop in to greet the members

and help serve them a warm meal … and the seniors loved and respected her for making them feel special." (*Id.*)[13]

Ms. Ash's friend, James Conolly, sums it up succinctly and effectively – Ms. Ash is "a good person, who made a poor choice." (J. Conolly Letter, Ex. D-10.) She has spent a lifetime working to improve the lives of others and to provide a voice to those who would otherwise not be heard.[14] The interests of justice would best be served not by removing Ms. Ash from her community, but by permitting Ms. Ash to continue to serve it.

## III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

### A. Ms. Ash's Conduct Was an Aberration in a Life Dedicated to Public Service

As described at length above, the numerous letters of support that the Court has received from neighbors, family, former colleagues, and friends of Ms. Ash paint a consistent picture – surprise and even shock at the conduct in this case, which stands in such stark contrast to the loving, supportive and honorable person they know. (Former Councilman D. Recchia Letter, Ex. C-14, at 1; L. Clarke Letter, Ex. D-7; Pastoral Committee Letter, Ex. B-4, at 1; Rev. S. Hamilton-Gonzales Letter, Ex. B-3, at 1.) As her sister stresses, "the Sylvia Ash who is in front of you is NOT the true Sylvia Ash." The real Ms. Ash is "a loving and supportive" sibling and mother, "a highly respected individual in her community, and someone who is compassionate

---

[13] Ms. Ash's devotion to equality, justice and championing the disadvantaged and those in need also is evident in the work she performed before becoming a judge. As described above, Ms. Ash championed immigrant rights, assisting individuals in obtaining their citizenship as part of her work at DC 37. She also served as an advocated for victims of domestic violence and worked to assist non-custodial fathers to stay active in their children's lives. The impact of Ms. Ash's DC 37 work is summed up by the letter of support the Court has received from Congresswoman Yvette Clarke, who noted that in her work at DC 37, Ms. Ash was "a champion for the most vulnerable of our communities." (Congresswoman Y. Clarke Letter, Ex. D-9, at 1.)

[14] Even Ms. Ash's ultimately ill-fated time on the MCU's Board of Directors arose from her instinct to serve her community. Many of the MCU's members are municipal employees, including the DC 37 union members on whose behalf Ms. Ash advocated for 20 years. Ms. Ash viewed her service on the MCU Board, in part, as an opportunity to continue to help those employees.

and considerate and always willing to help others in need."  (L. Ash-Robinson Letter, Ex. A-4, at

3.)

The conduct that brought Ms. Ash before the Court should be viewed in the context of

her life of service and her personal characteristics as further detailed herein.  Ms. Ash's

misguided support of a person who she viewed as a friend, Wong, and her failure to produce the

materials requested by the government have destroyed the professional reputation and good

name that she spent a lifetime building. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████)[15]  Accordingly, a non-custodial sentence is

appropriate here and fulfills the goals of sentencing.

### B.    Ms. Ash's Conduct Did Not Meaningfully Hinder the Prosecution of Wong and His Co-Conspirator

Ms. Ash deeply regrets the conduct that has brought her before the Court.  While not

seeking to minimize the severity of the conduct for which she stands convicted, it is relevant to

sentencing that her conduct did not prevent or significantly hinder the government's prosecution

of Wong or his principal co-conspirator, Guagliardo.

---

[15] Guidelines § 5K2.20 contemplates the granting of downward departure where an individual's conduct was the result of "single criminal occurrence or single criminal transaction," committed "without significant planning," that were of a "limited duration," and constituted "a marked deviation from an otherwise law-abiding life." *United States v. Castellanos*, 355 F.3d 56, 58 (2d Cir. 2003) (*citing* U.S.S.G. § 5K2.20).  However, even where courts have decided that § 5K2.20 does not apply, they are plainly permitted to consider a defendant's history of service to his or her community and, more generally, as a law-abiding citizen in evaluating the statutory factors under 18 U.S.C. § 3553(a).  *See, e.g.*, *United States v. Nesbeth*, 188 F. Supp. 3d 179, 193-94 (E.D.N.Y. 2016) (noting that even assuming a defendant did not qualify for a departure pursuant to § 5K2.20, where her crimes were a "marked deviation from an exemplary law-abiding life," a downward variance from the Guidelines was appropriate).

The government's evidence at trial focused heavily on Ms. Ash's failure to produce emails and text messages that were responsive to grand jury subpoenas.  There can be no doubt that Ms. Ash's decision to initially represent herself and to subsequently make an incomplete production of documents through counsel with little federal criminal experience was catastrophic.  But, as the Court is aware, the government, through the use of preservation letters and search warrants, obtained Ms. Ash's emails and text messages, notwithstanding her deletion of some of those materials.  And, the content of those materials did little to strengthen the government's case against Wong and Guagliardo because, as the government acknowledges, it is undisputed that Ms. Ash had no role in their embezzlement scheme.

The speed at which the government's case progressed against Wong demonstrates that its investigation was well-developed by February 2018 when it first approached Ms. Ash and was not significantly impeded by Ms. Ash's subsequent conduct.[16]  Wong was arrested on May 8, 2018, pleaded guilty to embezzling from the MCU on November 19, 2018, and was sentenced to 66 months' incarceration and ordered to pay roughly $9.8 million in restitution on June 4, 2019.[17]  (PSR ¶¶ 8, 20.)  Wong's prosecution thus was completed more than four months before Ms. Ash's arrest.  The case of Guagliardo, Wong's co-conspirator, moved similarly expeditiously.  He was arrested on October 10, 2019, pled guilty to embezzling from the MCU on January 10, 2020, and was sentenced to 27 months' incarceration and ordered to pay approximately $456,000 in restitution on July 23, 2020.  (PSR ¶ 21.)  Moreover, the materials Ms. Ash deleted and/or failed to produce were (a) ultimately obtained by the government and (b)

---

[16]  Ms. Ash was alleged to have engaged in obstructive conduct beginning in or about January 2018.  As the Court is aware, Ms. Ash was acquitted with respect to her signing of the January Memorandum in late January 2018.  As such, the core of the government's case against her related to the deletion and/or failure to provide emails and text messages and her statements to government agents about those issues.

[17]  The reference to Wong's plea on December 2, 2018 in Paragraph 20 of the Presentence Report appears to be incorrect.

not relevant to the embezzlement scheme under investigation since, as the government concedes, Ms. Ash had no involvement in that fraud.   Instead, as the exhibits admitted at trial showed, the texts were demonstrations of support to Wong, whom she misguidedly believed was a friend, and communications about things such as tickets and electronics that were unrelated to Wong's theft.

Ms. Ash does not make this argument to the Court to minimize her conduct or otherwise suggest that obstructive conduct is not a serious crime.  Instead, it is provided to place the crimes of which she was convicted within the broader context of the investigation of Wong and Guagliardo as is relevant to the sentencing factors, especially the nature and circumstances of the offense.

## IV.     THE NEED FOR JUST PUNISHMENT, DETERRENCE, SOCIAL PROTECTION, AND REHABILITATION

When imposing a sentence, the court must "conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense," *Cavera*, 550 F.3d at 184, and make an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49, 62 (2007).  To conduct this individualized assessment, courts must look to the factors set forth in 18 U.S.C. § 3553.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant;" 18 U.S.C. § 3553(a)(1), and the need for the sentence imposed to: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public; and (d) provide other correctional treatment.  18 U.S.C. § 3553(a)(2).  Courts must consider these factors to meet the overarching goal of sentencing, which is to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing under § 3553(a).

Because Ms. Ash's life will never be the same, because she has lost her license to practice law and her position as a judge, because she has already been publicly humiliated and bears the burden and shame of how her failings have impacted her family, friends, and community, and given the punishment that she already has begun to endure and will endure into the future, the goals of sentencing can be met without a custodial sentence. As described below, each of the factors that the Court must consider under § 3553(a) weighs in favor of the imposition of a non-custodial sentence.[18]

A.      **Just Punishment Does Not Require an Incarceratory Sentence**

The consequences of Ms. Ash's actions have been personally staggering. As a prominent and well-respected member of her community, Ms. Ash now finds herself at age 64 having resigned from her judicial position and given up her law license in a publicly embarrassing process. During the pendency of the case, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

---

[■]  As noted above, in the Presentence Report, Probation recommends a sentence of 12-months' imprisonment, which is well below the advisory Guidelines range. (PSR at 43.) A review of the § 3553(a) factors, however, demonstrates that a reasonable sentence for Ms. Ash is one that is non-custodial.

Ms. Ash is acutely aware of the negative impacts that her conduct, and her potential removal from her community, has had and may have on others, especially those closest to her. Most immediately, she is keenly aware that because of her responsibilities to care for her brother and aunt, as well as her son's father, the collateral consequences of an incarceratory sentence are particularly devastating.

More broadly, Ms. Ash has suffered the loss of her hard-earned reputation and standing in the community and the recognition that her acts have caused trauma for her family and close friends. *See United States v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008) (affirming a downward variance based on the "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation"). Her friends and colleagues have informed the Court about the devastating effect Ms. Ash's prosecution and conviction have had upon her. Attorney Anthony Ricco, who has come to know Ms. Ash during the pendency of this case, describes his conversations with her:

> Former Judge Ash has expressed a great level of heartfelt and soul searching remorse. Not remorse because she was convicted, but a remorse related to the realization that she not only let down her colleagues, and those who look up to and admired her professional achievements, but also that she let down the aspirations and the sacrifices made by her parents and ancestors who provided the foundation for her achievements. This realization weighs heavily on her heart and mind, and serves as motivation as she works to seek redemption.

(Attorney A. Ricco Letter, Ex. C-15, at 1; *see also* Hon. A. Fisher Rubin Letter, Ex. C-8 ("She has lost her reputation, her Judgeship, her ability to practice law and many of the people she thought were her friends. Surely, these are harsh results for her actions"); (Attorney A. Moreno Letter, Ex. C-12, at 2 ("Ms. Ash has endured shame and humiliation which, from my perspective, has been torturous. By virtue of her recent criminal conviction, she has lost the privilege of pursuing her chosen profession, the law"); Attorney M. Wachsman Letter, Ex. C-23,

at 3 ("The shame, embarrassment, and humiliation inherent in Justice Ash's conviction, coupled with the certain loss of her law license is punishment for her mistakes and poor judgment"); Attorney M. Shpelfogel Letter, Ex. C-19, at 2 ("She has already lost so much that she worked so hard to achieve – including her judgeship and her license. Having her lose her freedom as well would be too much … her family and our community need her").)

At the most fundamental level, Ms. Ash's life – personally and professionally – never will be even remotely the same as a result of her conviction.  The career and reputation she spent a lifetime to build has been destroyed.  Ms. Ash has lost "many of her closest professional colleagues, whom she normally relied upon for advice and guidance" and "found herself drowning with moral shame and disappointment in herself."  (Attorney A. Ricco Letter, Ex. C-15, at 1.)  The Court can further impose punitive measures on Ms. Ash, including community service and a term of supervised release that would reflect the seriousness of her offense, without imposing a term of incarceration.  Should the Court believe that more stringent measures are merited, Ms. Ash respectfully urges the Court to consider an imposition of a period of home detention, which is available to the Court as a condition of supervised release pursuant to the terms of USSG § 5F1.2.

**B.  A Non-Custodial Sentence Will Achieve the Goals of General and Specific Deterrence**

Ms. Ash's conduct has led to the destruction of her professional life and caused enormous pain to herself and those around her.  The very public nature of Ms. Ash's conviction and loss of her career and professional reputation stands as a highly visible and stark warning to the broader community that the obstructive conduct of which Ms. Ash was convicted has beyond serious consequences.  She has lost her livelihood and the professional stature she spent a lifetime

building and will always be a convicted felon.  These consequences will more than adequately

deter other public officials and the general public alike from engaging in similar conduct.

Furthermore, empirical data offers no support for the proposition that the imposition of a

prison sentence will accomplish general deterrence.  Anthony N. Doob & Cheryl Marie Webster,

*Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003)

(observing that there is "no conclusive evidence that supports the hypothesis that harsher

sentences reduce crime through the mechanism of general deterrence"); *see also United States v.*

*Discenza,* No. 14-CR-273, 2016 WL 3443586, at *1 (S.D.N.Y. May 31, 2016) (finding that "a

two-year term of probation both reflects the seriousness of the offense [of one count of

distributing oxycodone] and promotes general deterrence while accounting for Discenza's history

of providing valuable medical services"); *United States v. Beaufort,* No. 13-CR-125, 2014 WL

1278090, at *5 (E.D.N.Y. Mar. 19, 2014) (noting that "[g]eneral deterrence is satisfied by the

felony conviction and attendant collateral consequences").

Courts repeatedly have recognized that the goals of general deterrence in the context of

non-violent crime do not necessitate lengthy sentences as there is "considerable evidence that

even relatively short sentences can have a strong deterrent effect on prospective 'white collar'

offenders." *Adelson,* 441 F. Supp. 2d at 514.  Such offenders "are more likely to be deterred,

even by selective enforcement and modest penalties," as they have "much to lose from being

convicted, regardless of the penalty."  Richard S. Frase, Punishment Purposes, 58 Stan. L. Rev.

67, 80 (2005).

Finally, while described at greater length below, Ms. Ash poses no risk to the community

and thus a non-incarceratory term of supervision with conditions set by the Court would be a

meaningful deprivation of Ms. Ash's liberty.  Such a sentence would be sufficient to achieve

whatever deterrent effect the Court believes may not have already been met.  *See Gall*, 552 U.S. at 48-49 (describing probation as a punishment that "severely restricts an individual's liberty") (*quoting United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty")); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled").  Notably, a period of supervision will, by its terms, offer a specific deterrent to Ms. Ash as, should she violate the terms of her supervision, she will be subject to the penalties for any such violation – including incarceration.  As such, the deterrent goals contemplated by § 3553(a) can be met, in Ms. Ash's case, through the imposition of a non-custodial sentence.

### C.    Ms. Ash is Not a Threat to Re-Offend

As described at length above, Ms. Ash has led a law-abiding life and has no history of criminal conduct, making the risk of her engaging in recidivistic behavior virtually non-existent. In addition, there is essentially no likelihood that the circumstances that led to the crimes of conviction will arise in the future.  Accordingly, incarceration is an unnecessarily harsh punishment that will neither serve to protect the community nor promote specific deterrence.

Moreover, empirical research reflects the extremely low recidivism rates for offenders with no prior criminal history, such as Ms. Ash.  In 2004, the United States Sentencing Commission ("USSC" or the "Commission") issued a report as part of its research series on the recidivism of federal offenders.  As the report notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy … postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment. Congress itself in the Sentencing Reform Act of 1984 promotes the first offender philosophy, citing the relevance of reduced sentencing levels for first offenders under the federal sentencing guidelines.

United States Sentencing Commission (2004), Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate, at 1, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last visited Mar. 29, 2022).

Ultimately, the Commission found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a rate of 22.6% for offenders with one point, and 36.5% for offenders with two or more points). (*Id.* at 13-14, 16.) And, among the category of offenders with zero points, individuals who have no prior arrests have an even lower rate of recidivism - 6.8%. As the Commission notes, "[i]ts low recidivism rate makes first offender group A [which has no prior criminal events] stand out." (*Id.* at 14.) Ms. Ash, who has never been arrested prior to this case, falls squarely within the group of individuals who have, statistically, been the least likely to re-offend.

Ms. Ash's age also makes her an unlikely candidate to commit future crimes. Courts routinely consider a defendant's age in fashioning an appropriate sentence. *See United States v. Hernandez,* 604 F.3d 48, 54 (2d Cir. 2010) ("At the time of the 2009 re-sentencing … [the defendant] was 42 years old, a development that, though predictable by arithmetic, may … indicate a decreased likelihood of recidivism."); *United States v. Carmona-Rodriguez*, No. 04-CR-667, 2005 WL 840464, *5 (S.D.N.Y. Apr. 11, 2005) (observing that those defendants "over the age of 40 . . . exhibit markedly lower rates of recidivism in comparison to younger defendants"); *United States v. Eberhard*, No. 03-CR-562-01, 2005 WL 1384038, at *10 (S.D.N.Y. June 9, 2005) (finding 41-year-old convicted of fraud offenses unlikely candidate for future criminal conduct based on age and lack of prior criminal conviction)..

The Commission similarly has recognized that "[r]ecidivism rates decline relatively consistently as age increases."  United States Sentencing Commission (2004), *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 12, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited Mar. 29, 2022).  As a result, courts in this District and throughout the Second Circuit have "previously declined to impose Guidelines sentences on older defendants" in light of the Commission's conclusion. *United States v. Birkett*, No. 99-CR-338-01, 2006 WL 2819663, at *4 (S.D.N.Y. Oct. 2, 2006); *see also United States v. Sanchez,* No. 99-CR-338-12, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) (noting that "this Court and others have previously declined to impose lengthy Guidelines sentences on older defendants in light of the Sentencing Commission's conclusion").

The nature of the conduct before the Court is highly unusual and fact-specific, such that Ms. Ash will simply not be in a position to commit this type of crime in the future.  Further, Ms. Ash's age and lack of criminal history, coupled with her character and anticipated supervision, all make the risk of any recidivism or re-offending extremely unlikely. As demonstrated by the voluminous amount of letters of support written to this Court, Ms. Ash has immense support from the community which can be expected to assist her in her efforts to continue to find ways to contribute to society in a meaningful way.

### D.  § 3553(a)'s Rehabilitative Goals are Best Served by a Non-Custodial Sentence

The rehabilitative goals of § 3553(a) will be best served by the imposition of a non-custodial sentence.  If she is permitted to remain in her community, Ms. Ash both can focus on



Given Ms. Ash's role as a familial caregiver and her broader history of volunteering and other non-profit work, allowing her to remain in her community will best situate her to give back to society and make amends for her conduct.

Specifically, community members have stressed that there are many areas in which Ms.

Ash can have a positive impact in the future, including the following:

- "[W]e need for her to be able to continue to keep doing her good work." (Attorney S. Cohn Letter, Ex. C-7, at 2.)

- "There is no question in my mind that Ms. Ash is truly humbled and remorseful for the grievous mistakes she is now accounting for, and if given the chance, she would dedicate herself to being a fully giving member of the community." (Attorney M. Mirman Letter, Ex. C-11, at 2.)

- "[S]he still has so much to contribute to the community." (Attorney M. Schwartz Letter, Ex. C-16.)

- "[T]hose who are less fortunate and need her support … will suffer a great loss, because she will no longer be there to assist." (I. Pierce Letter, Ex. D-20.)

- "I know that Sylvia was planning to continue her community work even in retirement. It would be a loss to the Brooklyn and New York community if she were not able to do so." (L. Wade Letter, Ex. D-30.)

- "Now more than ever as our communities continue to recover from the pandemic, we need the experience, inspiration, empathy, and the power to uplift and these are the qualities that Judge Silvia Ash has always exemplified." (Former New York City Council Majority Leader L. Cumbo Letter, Ex. D-11, at 2.)

- "If she is granted the clemency to move past this mistake, I am certain that she would continue to serve our community with her time, knowledge, and skills, improving the community and the lives within." (J. Wilson Letter, Ex. D-31, at 2.)

- "Honorable Judge Kaplan, your display of clemency will propel her continuously to serve the community, improving the lives of our "Senior Citizens", [and] those members whose dignity has been trampled because of their economic status." (Rev. Hamilton-Gonzales Letter, Ex. B-3, at 2.)

- "I have no doubt that Ms. Ash is truly remorseful and if given the chance to most past the grievous mistakes that brought her before Your Honor, she can once again serve the community and better the lives of those around her." (Attorney H. Blank Letter, Ex. C-3, at 2.)

- "Incarceration serves no purpose in her case.  Sylvia has much to offer in the way of community service instead.  Let her work in the various charitable endeavors this court so deems proper in place of her spending these next years of her life incarcerated. Such would serve no purpose and provide no advantage to the State or its citizens." (Hon. S. Seddio, Ex. C-17, at 2.)

35

Given these factors, Ms. Ash's rehabilitation will be best served by letting her continue "giving the gift of her time, her talent and experience" to her fellow New Yorkers, (Attorney M. Shpelfogel Letter, Ex. C-19, at 2), not by removing her to a custodial setting.

Consistent with this request, Ms. Ash anticipates that, in advance of sentencing, she will be able to identify for the Court a not-for-profit entity with which she has an existing relationship that will be prepared to supervise any period of community service work that is imposed by the Court as a condition of Ms. Ash's sentence.

### E.    Need to Avoid Unwarranted Sentencing Disparities

Ms. Ash is a first-time, non-violent offender for whom alternatives to incarceration should be considered.  *See, e.g.*, United States Sentencing Commission (2009), *Alternative Sentencing in the Federal Criminal Justice System*, at 1, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf (last visited Mar. 29, 2022) (noting that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders"). The Commission's 2009 study indicated that in the first decade of the 21st Century, alternatives sentences to incarceration were imposed for between 15% and 25% of federal offenders.  (*Id.*)

Here, the imposition of a non-custodial sentence on Ms. Ash would be consistent with similar non-incarceratory sentences imposed on individuals with Ms. Ash's criminal history category, offense type, and age category.  Nor would the requested sentence result in an unwarranted disparity.  For instance, the Commission's Sourcebook of Federal Sentencing Statistics for Fiscal Year 2020 reflects that of the 2,439 defendants sentenced in the Second Circuit in 2020, only 727 (29.8%) received a within-the-Guidelines sentence.  United States Sentencing Commission (2021), *Statistical Information Packet: Fiscal Year 2020,* at Table 8,

available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/2c20.pdf (last visited Mar. 29, 2022).

Of the 924 defendants sentenced in the Southern District of New York in 2020, only 168 (18.2%) received a within-the-Guidelines sentence, *id.* at Table 9, with virtually all defendants sentenced outside the Guidelines range being sentenced *below* the applicable range.  (*Id.*) Further, Second Circuit courts have, in recent years, imposed non-custodial sentences in obstruction cases.  *See, e.g*, *United States v. Prezioso*, No. 19-CR-157 (S.D.N.Y. 2019) (defendant in an organized crime investigation who government informed the Court lied to investigators and withheld documents from grand jury was sentenced to three years' probation (June 3, 2019 Gov't Sentencing Letter and Judgment, Dkt. Nos. 17-18)); *United States v. Weissman*, No. 18-CR-524 (E.D.N.Y. 2018) (attorney convicted of conspiracy to obstruct an official proceeding sentenced to four years' probation (Dkt. No. 77)).  Here, for all of the foregoing reasons, Ms. Ash respectfully submits that below-Guidelines, non-custodial sentence is appropriate and warranted.

**V.     CONCLUSION**

For all of the reasons stated above, Sylvia Ash respectfully requests that the Court impose a sentence of time served, one three years' supervised release, with conditions of substantial community service and continued mental health treatment, which would be sufficient, but not greater than necessary, to fulfill the purposes of 18 U.S.C. § 3553(a).

Dated: New York, New York
   April 8, 2022

Respectfully Submitted,

MORRISON & FOERSTER LLP

By: */s/* Carrie H. Cohen
  Carrie H. Cohen
  Nathan D. Reilly
  250 West 55th Street
  New York, NY 10019
  Telephone: (212) 468-8000
  Facsimile: (212) 468-7900
  Email: CCohen@mofo.com
    NReilly@mofo.com

*Counsel for Defendant Sylvia Ash*

38