UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -*v.*-                                                     :          19 Cr. 780 (LAK)

SYLVIA ASH,                                                    :

                 Defendant.          :

------------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Eli J. Mark
Daniel C. Richenthal
Jonathan E. Rebold
Assistant United States Attorneys

Alona Katz
Special Assistant United States Attorney

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 2

      A.  The Defendant's Criminal Conduct .......................................................... 2

      B.  The Advisory Guidelines Range .............................................................. 4

      C.  The Probation Office's Recommendation ................................................ 5

DISCUSSION ..................................................................................................................... 5

I.   The Probation Office's Guidelines Calculation is Correct ....................................... 5

      A.  The Probation Offense Correctly Calculated the Loss of Wong's Embezzlement That the Defendant Knew About or Reasonably Should Have Known About ..................... 6

      B.  The Probation Office Correctly Applied the Sentencing Enhancement for Use of a Special Skill, Pursuant to U.S.S.G. § 3B1.3 ................................. 8

II.  A Substantial Term of Imprisonment—Meaningfully Greater Than the Recommendation of the Probation Office—Is Warranted ................................... 10

III. The Defendant's Arguments For a Sentence of Time Served Are Unpersuasive ................. 14

IV. The Court Should Impose A Substantial Fine ....................................................... 19

      A.  Applicable Law ....................................................................................... 19

      B.  Discussion ............................................................................................... 20

CONCLUSION ................................................................................................................. 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                      :

   -*v.*-                                                     :           19 Cr. 780 (LAK)

SYLVIA ASH,                                              :

              Defendant.                     :

-----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Sylvia Ash is scheduled to be sentenced on April 20, 2022, at 3:00 p.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 173) ("Def. Mem.").

## PRELIMINARY STATEMENT

Over the course of more than six months, the defendant, a then-judge, experienced attorney, and chair of the board of directors of Municipal Credit Union ("MCU"), a non-profit, placed her perceived self-interest and the interests of former MCU chief executive officer, Kam Wong, above the grand jury's search for truth.  She did so in several and evolving ways, from signing false memoranda that were provided to the Government, to lying to federal investigators on multiple occasions, to concealing and deleting documents, to wiping an Apple iPhone that Wong had given her to influence her to agree to obstruct justice for his benefit.  Although her obstruction occurred when she was no longer on MCU's board, she sought to cover up highly questionable conduct that she had engaged in while she was on the board, including her receipt of benefits and reimbursements for personal expenditures, her violations of judicial ethics by serving on the board, and her filing of false annual financial disclosure forms.  This was serious conduct that took place

over time, significantly impacting the federal investigation and undermining the rule of law and the functioning of the grand jury.  It deserves serious punishment.

The United States Sentencing Guidelines ("Guidelines") appropriately reflect the defendant's wide-ranging, calculated, and repeated obstruction of justice.  The defendant faces an advisory Guidelines range of 46 to 57 months' imprisonment, as set forth in the Presentence Investigation Report ("PSR") of the United States Probation Office ("Probation Office"), in which the Probation Office recommends a sentence of 12 months' imprisonment and a $20,000 fine.

Considering all facts and circumstances of this case, although the Government agrees with the Probation Office that a sentence below the Guidelines range would be reasonable, given the nature and circumstances of the offense, the defendant's history and characteristics, and the need to promote respect for the law and general deterrence, the Government submits that a substantial sentence of imprisonment is warranted, meaningfully above the Probation Office's recommended sentence.

## **BACKGROUND**

### A.  The Defendant's Criminal Conduct

As described in greater detail in the PSR, in Complaint 19 Mag. 9341, and in Superseding Indictment S1 19 Cr. 780—and as overwhelmingly proven at trial—the defendant, an experienced lawyer and judge and former director and chair of MCU, agreed to and did obstruct the federal investigation of misconduct committed by MCU's chief executive officer, Wong, and others, including herself, and made false statements to federal investigators.  (PSR ¶¶ 10-78.[1])

After the defendant learned of the federal investigation into Wong in January 2018, and after Wong had falsely told law enforcement that the defendant had personally approved of

---

[1]     Because the Court presided over the trial, the Government will not describe all aspects of the scheme or cite all relevant evidence herein.

millions of dollars he had received purportedly in lieu of a disability insurance policy, the defendant signed not one but two copies of a false and misleading memorandum about that money, which memoranda were subsequently provided to the federal government (both to the U.S. Attorney's Office for the Southern District of New York and to the National Credit Union Administration, the federal regulator that supervises credit unions like MCU).  (PSR ¶¶ 29-48.)

Then, in March 2018, after Wong was placed on leave by MCU, in an effort to protect Wong and explain her having previously signed the false memoranda, during an interview with the Government, the defendant falsely stated that MCU's then-General Counsel Thomas Siciliano had said that Wong was entitled to the money he had embezzled under the terms of his employment contract, even though she had no such conversation with Siciliano, she knew Wong's contract did not permit him to take millions of dollars of cash in lieu of a disability policy, and she knew that MCU's board had never approved of such payments.  (PSR ¶ 57.)

The defendant's obstruction did not stop there, as she continued telling lies to the Government on multiple occasions over the course of the next several months.  (PSR ¶¶ 61, 62, 72.)  She also deleted text messages, emails, wiped multiple electronic devices, and concealed other documents from the grand jury in an effort to protect Wong and avoid scrutiny of her own actions, including the gifts, benefits, and reimbursements she had received from Wong and MCU during the time she served on MCU's board (even though she was prohibited from serving on the board under the applicable judicial rules), as well as gifts and benefits that Wong had provided to the defendant in order to induce her to assist him in obstructing justice, all of which she had concealed on her annual financial disclosure forms.  (PSR ¶¶ 58-77.)

**B.  The Advisory Guidelines Range**

The Probation Office calculates the defendant's advisory Guidelines range as follows, a calculation with which the Government agrees.

- Pursuant to U.S.S.G. § 3D1.2(d), all counts are grouped.  (PSR ¶ 83.)

- Pursuant to U.S.S.G. § 2J1.2(c), because the offense involved obstructing the investigation or prosecution of a criminal offense, to wit, the embezzlement and fraud scheme committed by Wong, U.S.S.G. § 2X3.1 is applied because it produces a higher guideline range than otherwise calculated under § 2J1.2.[2]  (PSR ¶ 84.)

- Pursuant to § 2X3.1(a), the base offense level is six levels lower than the offense level for the underlying offense.  In this case, because the underlying criminal offense involves a violation of 18 U.S.C. § 657, the offense is governed by U.S.S.G. § 2B1.1.  (PSR ¶ 85.)

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for the underlying offense is 7, because the statutory maximum term of imprisonment is 20 years or more.  (PSR ¶ 86.)

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(G), because the loss or intended loss of the underlying offense, which was known to the defendant, or reasonably should have been known to the defendant, was greater than $3,500,000 but not greater than $9,500,000, the offense level is increased by 18 levels.  (PSR ¶ 87.)

- Pursuant to U.S.S.G. § 2B1.1(b)(17)(1), because the underlying offense involved deriving more than $1,000,000 in gross receipts from a financial institution as a result of the offense, which was known or reasonably should have been known to the defendant, the offense level is increased by 2 levels.  (PSR ¶ 88.)

- Pursuant to U.S.S.G. § 3B1.3, the offense level is increased by 2 levels, because the defendant abused a position of public or private trust, or used a special skill, specifically, her knowledge and experience with attorney-client privileged and the

---

[2]      In her sentencing submission, the defendant does not dispute the otherwise applicable range and, in fact, asserts it should apply here.  (Def. Mem. 4-5.)  Under U.S.S.G.§ 2J1.2(a), the base offense level is 14.  After accounting for a three-level increase pursuant to U.S.S.G. § 2J1.2(b), because the offense resulted in a substantial interference with the administration of justice, and a two-level increase pursuant to U.S.S.G. § 2J1.2(b)(3)(B) and (C) because the offense involved the selection of any essential or especially probative records, documents, or tangible objects to destroy or alter; and/or was otherwise extensive in scope, planning, or preparation, the resulting offense level under U.S.S.G. § 2J1.2 would be 19.  (PSR ¶ 84 n.8; *see also* Def. Mem. 5 n.3 ("Footnote 8 to the Presentence Report sets forth the offense level that would apply pursuant to USSG § 2J1.2(b) if, as [the defendant] submits, USSG § 2J1.2(c) does not apply.").)

role of a general counsel, in a manner that significantly facilitated the commission or concealment of the offense.  (PSR ¶ 91.)

In accord with the above, the total offense level is 23.  (PSR ¶ 96.)  The defendant has no known prior convictions, so her Criminal History Category is I.  (PSR ¶¶ 99, 100.)  Based upon these calculations, the defendant's advisory Guidelines range is 46-57 months' imprisonment and a fine of $20,000 to $200,000.  (PSR ¶¶ 130, 140.)

### C.  The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, her physical and mental health, the nature and circumstances of her offenses, and the objectives of punishment, deterrence, and promotion of respect for the law, the Probation Office recommends a sentence of 12 months' imprisonment and a $20,000 fine. (PSR pp. 40, 42.)

### DISCUSSION

### I.    The Probation Office's Guidelines Calculation is Correct

The defendant advances multiple challenges to the Probation Office's Guidelines calculation, asserting that her total offense level should be only 19.  (Def. Mem. 5, 7.)  A ruling in the defendant's favor on both of her challenges would result in an advisory Guidelines range of 30-37 months' imprisonment.  (*Id.*)  As set forth below, each of the defendant's challenges to the Probation Office's calculation is wrong, although the challenges, even if correct, need not be resolved by this Court if they would not affect the defendant's sentence.  *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).

### A. The Probation Offense Correctly Calculated the Loss of Wong's Embezzlement That the Defendant Knew About or Reasonably Should Have Known About

The defendant contends that "it was undisputed at trial that [she] had no knowledge of Wong's embezzlement scheme" and therefore her base offense level should not be determined by the scope of his scheme. (Def. Mem. 4.) The defendant's assertion is inconsistent with the trial record and the undisputed factual assertions in the PSR.

The evidence at trial demonstrated, as the PSR states, that at the time the defendant agreed to and did obstruct the Government's investigation she knew or reasonably should have known that Wong had embezzled substantially more than $3,700,000, which reflects the amount that Wong claimed he received and was entitled to as supposed long-term disability offset payments, as well as taxes that he had MCU pay on that amount. (PSR ¶ 78.)[3] Specifically, in January 2018, after Wong learned about the federal investigation of millions of dollars he took from MCU, he first falsely claimed that MCU's board approved that money and then, after being confronted on that lie, Wong pivoted to falsely claiming that the defendant had orally approved that money in lieu of a disability insurance policy (when in truth and in fact, as the defendant later admitted, she did not). (PSR ¶¶ 29, 30, 33, 38, 56.) Wong then provided the defendant with an Apple iPhone, Airpods, and promised her a $25,000 donation from MCU to an organization for which she was fundraising, in exchange for her signing a memorandum that falsely claimed the defendant had

---

[3] The Guidelines provide that "specific offense characteristics that were known, or reasonably should have been known, by the defendant" apply to enhance the base offense level. U.S.S.G. § 2X3.1, App. Note 1; *see also United States v. Sampson*, 898 F.3d 287, 312 (2d Cir. 2018) (affirming increase in offense level for loss amount of fraud that was subject of defendant's obstruction where defendant "knew or reasonably should have known" of loss) (alterations incorporated; ellipsis omitted). Here, the Government has not asserted that the defendant knew or reasonably should have known of the full scope of Wong's fraud, which totaled more than $9.8 million, but instead that she knew or reasonably should have known of the aspect of the fraud that related to the payments Wong purportedly received in lieu of the disability insurance policy.

"approved," in June 2015, these payments amounting to "$3,700,000 (net of taxes)." (PSR ¶¶ 31, 32, 34-37, 39-42.)[4]  The defendant then signed that memorandum (which Wong provided to the Government shortly thereafter) and the defendant signed a second copy of the memorandum about a week later, after she was contacted by a federal agent. (PSR ¶¶ 41, 42, 45, 46, 48.)  Plainly, by the time the defendant had signed not just one, but two copies of the memorandum falsely stating that she had "approved" "$3,700,000" that Wong had received purportedly in lieu of an insurance policy, the defendant knew or reasonably should have known that Wong had embezzled that money.[5]

The defendant's obstruction, of course, continued after signing those memoranda, and included falsely claiming that, even though she had not approved these payments, they were nonetheless permissible under Wong's employment contract according to Siciliano—a lie that she first told to law enforcement on March 1, 2018 after Wong was placed on leave by MCU and that

---

[4]      Although the Government chose not to offer evidence of the $25,000 donation that Wong offered to the defendant after being contacted by law enforcement, the Court may consider that conduct in determining the appropriate sentence. *See, e.g.*, *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996) ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come." (internal quotation marks omitted; alteration incorporated)).  In addition, the Court may consider that the defendant's solicitation of that donation violated the judicial rules against fundraising, which rules the advisory committee on judicial ethics had specifically informed the defendant prior to her service on the organization's board. (PSR ¶ 32.)

[5]      The defendant offers no support for her proposition that "reliance" on the defendant signing the memorandum is "misplaced as the jury acquitted her" of Count Two relating to the memorandum. (Def. Mem. 4.)  It is settled law that, "when determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal." *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994); *see also, e.g.*, *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct."); *Sisti*, 91 F.3d at 312.  Moreover, the defendant does not dispute that she engaged in the conduct at issue in Count Two, and her acquittal on that count does not in any way undermine the proven fact that by at least the time the defendant—a sophisticated and experienced lawyer and judge—signed the memorandum the second time, she knew or reasonably should have known that Wong had embezzled that money.

she repeated to law enforcement on July 9, 2018 after Wong had been publicly charged with embezzlement from MCU.  (PSR ¶¶ 57, 72.)  Thus, to the extent that there may be any doubt (and there should not be) that the defendant knew or reasonably should have known about the millions of dollars that Wong embezzled from MCU at the time she signed the memoranda, there can be no doubt that *after* she signed the memoranda, and continued to engage in numerous obstructive acts, she knew or reasonably should have known that Wong's embezzlement substantially exceeded $3,700,000.

In short, there is no plausible way to read the record at trial as supporting any conclusion but that, even if the defendant did not know about Wong's embezzlement at the time it occurred, she knew or reasonably should have known that Wong engaged in a multi-million dollar embezzlement at the time she agreed to and did obstruct justice and lie to federal investigators. The Probation's Office's calculations therefore were correct.

### B.  The Probation Office Correctly Applied the Sentencing Enhancement for Use of a Special Skill, Pursuant to U.S.S.G. § 3B1.3

The Probation Office determined the Guidelines enhancement for use of a "special skill, in a manner that significantly facilitated the commission or concealment of the offense," under Section 3B1.3 is applicable based on the defendant's "knowledge and experience with attorney-client privilege and the role of a general counsel" (PSR ¶ 91).  *See* U.S.S.G. § 3B1.3, cmt. n.4 (identifying "lawyers" as an example of individuals possessing special skills).  Objecting to the application of this enhancement, the defendant asserts that her conduct "does not reflect her use of any specialized knowledge or expertise with respect to the law or the legal system."  (Def. Mem. 7.)

As an initial matter, there is no dispute that the defendant is a lawyer and that in the case of attorneys, courts have applied the sentencing enhancement based on their use of specialized

legal skills.  (*See id.* at 5.)  This includes in circumstances where a lawyer uses his or her skills as an attorney to facilitate the obstruction of justice.  *See, e.g.*, *Sampson*, 898 F.3d at 313 (upholding district court's decision that the enhancement applied because the defendant "relied on his skills as an attorney in his endeavors to obstruct justice," including his knowledge of what stage of a criminal investigation witnesses would be identified, what steps the prosecutor's office was likely to take and which defense attorneys to recommend for co-defendants); *United States v. Villalobos*, 567 F. App'x 541, 543-544 (9th Cir. 2014) (upholding district court's application of sentencing enhancement because defendant's "special skills as a lawyer significantly facilitated the commission of the crimes" of attempted extortion and endeavoring to obstruct justice, arising from, among other things, using "his knowledge of the grand jury system" to advise accomplice that grand jury witness would not be able to contradict accomplice's statements).

As the evidence at trial demonstrated, and as discussed above, after agreeing to sign Wong's false and misleading memoranda about the purported long-term disability insurance offsets he received, the defendant was contacted by law enforcement in late January 2018.  Rather than admit the full truth, the defendant continued to obstruct justice and, in doing so, she utilized her legal training and experience.  Specifically, she relied on her understanding of the role of an entity's general counsel, how advice from an attorney can potentially protect a defendant from liability, and attorney-client privilege.  As detailed at trial, during her first meeting with law enforcement, although she admitted that Wong's memorandum was false, she pivoted to a new lie to seek protect herself and Wong.  (PSR ¶¶ 56, 57.)  That lie was that Siciliano, MCU's then general counsel, had allegedly stated that the payments Wong received were permissible under Wong's employment contract.  (PSR ¶ 57.)  As the defendant knew, because of her training as a lawyer and a judge, if Siciliano had made such a statement—which, the investigation later

determined, he had not—it could have presented a potential defense for Wong to embezzlement, and also would have provided a potential innocent explanation, in part, for why the defendant had signed Wong's memoranda. Furthermore, as the defendant knew, investigating and proving that the defendant lied about any advice Siciliano may have provided would be difficult, because MCU could assert attorney-client privilege over communications with Siciliano (as it ultimately did). Indeed, the Government did not review all pertinent documents pertaining to Siciliano for several years, until the defendant and MCU entered into a Rule 502 non-waiver agreement that was approved by the Court shortly before trial. (*See* Dkt. No. 120.)

Accordingly, the evidence at trial amply demonstrates that the defendant's specialized legal training and knowledge facilitated her and Wong's schemes (even though they were not ultimately successful). The mere fact that a layperson could in theory have attempted to obstruct the investigation in a similar manner does not make the enhancement any less applicable. *See United States v. Fritzson*, 979 F.2d 21, 22-23 (2d Cir. 1992) ("The fact that the same offenses could have been committed by a person without the defendant's special training is immaterial; a § 3B1.3 adjustment is proper where the defendant's special skills increase his chances of succeeding or of avoiding detection."); *see also Sampson*, 898 F.3d at 313 ("that Sampson's offenses did not directly relate to his status as an attorney and could have been committed by a layperson is immaterial" (internal quotation marks omitted)).

## II.   A Substantial Term of Imprisonment—Meaningfully Greater Than the Recommendation of the Probation Office—Is Warranted

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a substantial term of imprisonment.

*First*, the nature and seriousness of the offenses and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant was an experienced

attorney and judge with prominent standing in the legal community.  And it was precisely this reputation that led Wong to reach out to the defendant for assistance in the federal investigation to cover-up his crimes, and that the defendant sought to draw upon when she met with the Government, telling lies and concealing documents.

This was exceedingly serious, and deliberate, criminal conduct.  *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 342, 343, 345 (1974) ("The institution of the grand jury is deeply rooted in Anglo-American history. . . . The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement."); *United States v. Cornielle*, 171 F.3d 748, 753 (2d Cir. 1999) ("[P]erjury goes to the very heart of the fair administration of justice.  No legal system can long remain viable if lying under oath is treated as no more than a social solecism.").  In her submission, the defendant repeatedly seeks to minimize this egregious conduct, never genuinely expressing remorse or acknowledging the harm her conduct caused to the federal investigation or MCU and its members.  (*See, e.g.*, Def. Mem. 24 (asserting that she "did not prevent or significantly hinder the government's prosecution of Wong"); *id.* at 25 (suggesting that her corrupt actions were not a deliberate decision and may be explained by her initial decision to "represent herself" and then to retain "counsel with little federal criminal experience").)  The defendant's choice to represent herself did not cause her crimes.  Plenty of people—especially lawyers— represent themselves, without engaging in repeated lying and obstruction of justice.  Nor is her initial choice of retained counsel to blame for her criminal conduct.  Plenty of people without lawyers are served with subpoenas or questioned by law enforcement, and do not commit obstruction of justice, much less over time.  Of course, the defendant herself was also an experienced lawyer and judge—and she notably does not allege that her initial retained counsel told her to commit obstruction of justice or that she was unaware that doing so was both wrong

and illegal.   And although the defendant's criminal conduct ultimately did not prevent the

successful prosecution of Wong, the defendant's failure to tell the truth about Wong and her lies

regarding Siciliano did delay charges being brought for that conduct.[6]  The defendant's obstruction

also caused the Government to expend resources to get to the truth and obtain those documents

she had concealed and withheld.

But the impact of the defendant's crimes was not merely limited to the expenditure of

resources by the Government.  MCU, in its letter to this Court, describes the wide-ranging impact

of the defendant's conduct, both while on its board and later when she helped cover-up for Wong:

> The defendant's crimes did not harm a faceless corporation, but instead harmed the hundreds of thousands of New York City municipal worker members who rely on the Credit Union for their financial security, and the hundreds of hardworking New Yorkers that the Credit Union employs.  The defendant did not act in the best interest of the Credit Union's members—many of whom are police officers, teachers, firefighters, clerks, nurses, home health aides, taxi dispatchers, cemetery workers, social workers, or counselors—the defendant sought only to enrich and protect herself when faced with the consequences of her actions.  Ms. Ash's loyalty to Mr. Wong was more valuable to her than her fiduciary obligations to the municipal worker members she promised to serve as first a member and then a Chair of MCU's Board of Directors.

(Letter from Kyle Markland, Chief Executive Officer, MCU, dated April 13, 2022 ("MCU Ltr."),

enclosed as Exhibit A, at 5.)

*Second*, the history and characteristics of the defendant, the nature and the circumstances

of the offenses, and the need for the sentence imposed to promote respect for the law warrant a

substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant did not engage in

---

[6]     Wong was not charged with embezzlement until three and a half-months after the Government first contacted the defendant to talk with her, and even after Wong was charged, he was not initially charged with embezzlement arising from the disability insurance offset scheme, although the complaint against him detailed the suspicious nature of these payments. Wong ultimately pled guilty to an embezzlement scheme that included this conduct on November 19, 2018.

obstruction of justice hesitantly or fleetingly.  She did so for more than six months, in multiple and nuanced ways, and without any apparent hesitation.  Indeed, it is apparent that she spent significant time thinking about how to conceal what she had done, including through providing a cover-story to an Apple customer service employee when she asked for their help with wiping the iPhone Wong had given her.  (PSR ¶ 65.)  In short, the defendant had plenty of chances to stop committing criminal conduct—but she did not, notwithstanding that she is an experienced attorney and judge.  The Court's sentence should reflect this fact.  It should also reflect that the defendant engaged in other relevant misconduct, which, whether criminal or not, abused her position at MCU, hurt MCU and its members, violated her judicial ethics, undermined faith in the judiciary, and were motivated by greed and a desire for prestige.

Apart from the conclusory statement that she "deeply regrets the conduct that has brought her before the Court" (Def. Mem. 24), the defendant has not shown any genuine remorse for what she did or concern for MCU or the harm she caused, or even acknowledged that her actions and her choices are what led to her prosecution.  On the contrary, the defendant's concerns appear solely focused on her own loss of standing, and related consequences.  (*See id.* at 28.)

*Finally*, the need for general deterrence strongly weighs in favor of a significant sentence. *See* 18 U.S.C. § 3553(a)(2)(B).  As described above, the defendant made it difficult to detect her obstructive conduct timely or to uncover its full scope.  When such a scheme is successfully prosecuted, a substantial sentence is warranted.  *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and

13

fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

### III.   The Defendant's Arguments For a Sentence of Time Served Are Unpersuasive

In her sentencing submission, the defendant requests time served, which would effectively be a sentence of *three days'* imprisonment—a drastic variance from the Guidelines range calculated by the Probation Office or the Guidelines range that she suggests is accurate, and far lower than what the Probation Office recommends.   The defendant does not deserve such a shockingly low sentence.   In support of this request, she presses multiple arguments.   None warrants the extraordinary sentence that she seeks.

*First*, the defendant asserts that the Guidelines are "excessive" and "patently unreasonable" as applied to her conduct, because she was not "a participant in, nor a beneficiary of, Wong's embezzlement scheme."  (Def. Mem. 7, 8.)  However, the Guidelines already account for the fact that she was not charged with embezzlement, by applying a six-level reduction to Wong's Guidelines calculation.   *See* U.S.S.G. § 2X3.1(a)(1).   Moreover, although the defendant was not charged with embezzlement, her obstruction scheme helped to cover-up Wong's embezzlement (which occurred while she was a director, and grew as a result of the disability offset fraud scheme that commenced almost immediately after she became chair of the board), and she personally benefited substantially while Wong was CEO from reimbursements and gifts authorized on his watch, including for her birthday parties, vacations, personal cellphone, internet, and cable bills. *See also* MCU Ltr. 3 ("It is clear that Ms. Ash was loyal to Mr. Wong because of their quid-pro-quo relationship: he funded her lifestyle, even long after she resigned from her position with MCU, and she ultimately covered up his malfeasance.")

*Second*, the defendant asserts that her conduct was an "aberration." (Def. Mem. 23.)  If the defendant means that she has not previously been accused of obstruction of justice or a federal crime, that is true.  But it is equally true, as described above, that the obstruction scheme here lasted for more than six months, and was committed in multiple, thoughtful ways.  The defendant plainly did not simply have a momentary or solitary lapse in judgment.

Nor is the conduct of which the defendant was convicted the only misconduct in which she engaged.  As the evidence at trial demonstrated and as is recounted in the PSR, the defendant repeatedly sought to use her connections and power to enrich herself and evade scrutiny for her actions: she received reimbursements and gifts from MCU and Wong for personal expenditures, as described above, and then evaded taxes on portions that were reported by MCU to her as taxable income; she violated her judicial ethics by serving on MCU's board and then misled the judicial conduct committee when it questioned her about her service; and she failed to truthfully file financial disclosure forms.  Irrespective of whether the foregoing conduct was criminal, it may be considered by the Court.  *See, e.g.*, *Reese*, 33 F.3d at 174.  These are not the actions of person who simply "viewed her service on the MCU Board . . . as an opportunity to continue to help [municipal] employees." (Def. Mem. 23 n.14.)  In any event, given the length, complexity, and deliberate and repeated nature of the defendant's criminal conduct as demonstrated at trial alone, a substantial term of imprisonment is warranted regardless of what else she has done or not done.

*Third*, the defendant suggests that her background, and in particular, service as an attorney for a municipal labor union and as a state court judge warrants significant and special leniency. (Def. Mem. 9, 23-24.)  But while the defendant's prior service is admirable, it is apparent that she took advantage of the trust others placed in her, at least in part as a result of her service, and related connections, to continue serving on MCU's board (after having been advised to resign) and then

to engage in the obstruction scheme for which she stands to be sentenced.  Her prior service does not excuse what she did—if anything, it exacerbates the impropriety of it—and it does not warrant what she seeks.

*Fourth*, the defendant describes charitable and other public-minded acts in which she has engaged.  (Def. Mem. 10, 17-23.)  It is appropriate that the Court consider these acts.  But the law accords with common sense.  Such acts warrant a downward departure only where they are "present to an exceptional degree or in some other way makes the case different from the ordinary case where [they are] present."  *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)). *Cf., e.g.*, *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman").[7]  In any event, while the defendant's good works may be one of the factors that warrant a below-Guidelines sentence, they do not warrant the extraordinarily low sentence of time served that she seeks.

*Fifth*, she suggests that the impact on her family warrants a sentence of time served.  (Def. Mem. 3, 13-17, 28.)  It too does not.  The argument that the defendant asks this Court to accept could be made in virtually every case.  It is not unique to the defendant, and is at odds with Section

---

[7]      There is also some reason to question whether at least certain of the defendant's charitable acts were as selfless as she suggests.  As MCU explains, the defendant caused it "to 'donate' thousands of dollars to many of the community organizations that she also was involved with—for events such as galas that [the defendant] attended to promote herself, not the Credit Union." (MCU Ltr. 5; *see also id.* at 2.)

3553(a), which focuses the Court's attention in imposing sentence on the defendant and her offense, not the impact of incarceration on the defendant's family. *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (same); *see also Koon v. United States*, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)). There is nothing about the defendant's family circumstances that merits the sentence she seeks. On the contrary, the defendant has more resources at her disposal, which may be used to support her family while the defendant is serving her sentence, than the average family dealing with the incarceration of a family member.

*Sixth*, she describes certain physical and psychological conditions from which she suffers. (Def. Mem. 14-16, 33, 34.) It is of course wholly appropriate for the Court to take these into account, but none appears unique for someone of her age or uncommon for someone convicted of serious crimes, none prevented her from committing her crimes, and all can be treated appropriately in prison, contrary to her conclusory assertion, in support of which she cites nothing, that she has the sort of medical "needs that often remain unmet by the medical services provided to BOP inmates" (*id.* at 34). As the Court is aware, the Federal Bureau of Prisons is well-equipped to handle all such conditions, including, if need be, in a Federal Medical Center (although the defendant's conditions appear both stable and manageable).

*Seventh*, the defendant appears to suggest that the need to "avoid unwarranted disparities" among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), warrants a sentence of time served in this case. (Def. Mem. 36-37.) However, the

17

defendants in the two cases cited by the defendant (*United States v. Prezioso*, No. 19 Cr. 157 (S.D.N.Y.) and *United States v. Weissman*, No. 18 Cr. 524 (E.D.N.Y.)) are plainly dissimilar.  Both defendants pled guilty, accepted responsibility for their conduct, and had very low Guidelines ranges (0 to 6 months' imprisonment and 6 to 12 months' imprisonment, respectively), reflecting the less significant nature of their criminal conduct.  The defendant also omits numerous other obstruction cases in which defendants received far above what she seeks, including:

- In *Unites States v. John Sampson*, No. 13 Cr. 269 (DLI) (E.D.N.Y.), the defendant, a former New York state senator, was sentenced to 60 months' imprisonment, after he was convicted at trial of obstruction of justice and making false statements in connection with his efforts to interfere with the investigation of a close associate who had given the defendant an undisclosed loan.

- In *United States v. Alfred Villalobos*, No. 09 Cr. 824 (GHK) (C.D. Cal.), the defendant, an attorney, was sentenced to 36 months' imprisonment, after he was convicted at trial of obstruction of justice and extortion in connection with accepting money in exchange for promising to coach his client to provide false statements to the prosecutor and grand jury.

- In *United States v. Richard Kelly*, No. 09 Cr. 348 (DRH) (E.D.N.Y.), the defendant, an attorney and businessman, was sentenced to 18 months' imprisonment, after he was convicted at trial for endeavoring to obstruct and impede the due administration of the Internal Revenue laws by providing an IRS agent a false document in an effort to substantiate an income tax deduction on his return.

- In *United States v. Perry Reich*, No. 04 Cr. 587 (NGG) (E.D.N.Y.), the defendant, an attorney, was sentenced to 27 months' imprisonment, after he was convicted of obstructing a judicial proceeding, forging a judge's signature, and making a false statement to a federal officer, in connection with his fabrication of a court order in a civil lawsuit.

- In *United States v. Raheem Brennerman*, No. 17 Cr. 155 (LAK) (S.D.N.Y.), the defendant, a businessman, was sentenced to 24 months' imprisonment, after he was convicted of criminal contempt of court for failing to comply with civil discovery orders.

- In *United States v. Christopher Simon*, No. 12 Cr. 720 (PAE) (S.D.N.Y.), the defendant, a 25 year-old, was sentenced to 12 months' imprisonment, after he pled guilty to obstruction of justice for submitting a falsified college transcript in connection with a supervised release violation sentencing.

None of this is to say that this Court should reflexively impose the same or a similar sentence to that imposed in other cases.  The defendant should be sentenced for who she is and what she has done, regardless of the sentences imposed in other cases.  But to the extent that the defendant asks this Court to consider other cases, they do not support her extraordinary request.

## IV.     The Court Should Impose A Substantial Fine

### A.  Applicable Law

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).  The Guidelines provide that a court "shall impose a fine in all cases, except where the defendant establishes that [s]he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).

In determining the size of any fine, the sentencing court shall consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of [her] earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and [her] dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;

(7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) any other pertinent equitable considerations.

*Id.* § 5E1.2(d). The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* The defendant bears the burden of demonstrating an inability to pay a fine. *See United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

### B. Discussion

The defendant has the ability to pay a fine, as the Probation Office has recognized. (PSR ¶ 128.) She reported to the Probation Office total assets of $2,223,000 and a total net worth of $2,013,685.[8] (PSR ¶ 124.) In addition, even though she recently resigned from the bench—although only after collecting her significant salary for more than two years during the pendency of this case while she was placed on paid leave (PSR ¶ 118)—in retirement she will continue to have significant income, including from rental income on her real estate, from her pension from serving as an attorney for a municipal labor union, and from another pension that she will be expected to receive from her service as a state court judge. The Probation Office recommends a

---

[8] In contrast, she reported to Pretrial Services that she had total assets of approximately $4,436,000. A substantial part of that variance is attributable to her statement to the Probation Office that she only has a one-sixth interest in the assets and income of the property located at 495 E. 95th Street (PSR ¶ 124 n.9, n.11), even though she reported the total property value to Pretrial Services as part of her assets. Moreover, the Government notes that the defendant's recent assertion that she only has a one-sixth interest in that property is in tension with multiple other records prepared for and/or filed by the defendant, including property records that indicate she jointly owns the property with one sibling, her previous annual financial disclosure filings that stated she owns a one-fourth interest in the property, and her tax returns that do not indicate that she shared ownership of that property. Regardless of what interest in that property she in fact has, she plainly has the ability to pay a substantial fine.

fine of $20,000 (PSR p. 40), at the bottom of the advisory Guidelines fine range as calculated by the Probation Office (PSR ¶ 140). The Government submits that a higher fine should be ordered, particularly given the resources that the defendant caused the Government to expend in this investigation, as well as the fact that the defendant continued to collect her substantial salary as a state court judge (which exceeded $210,000, annually) for more than two years during the pendency of this case, which was adjourned on multiple occasions on the defendant's motion.[9]

---

[9]      On April 8, 2022, counsel for MCU informed the Government that its position is "that MCU is entitled to full and timely restitution of eligible costs incurred as a result of the defendant's actions that resulted in her conviction and to be heard in connection with the defendant's PSR and at sentencing." The Government has not yet determined whether MCU appropriately may be considered a "victim" of the defendant's offenses of conviction and, therefore, entitled to restitution. *See* 18 U.S.C. § 3663(a)(1)(A), (a)(2). In circumstances, such as here, where the precise restitution figure has not been identified more than 60 days prior to sentencing, or there is a factual and/or legal dispute about the victim's losses, "the court may require additional documents or hear testimony," and can defer "a date for the final determination of the victim's losses," for up to 90 days after sentencing. 18 U.S.C. § 3664(d)(5); *see also Dolan v. United States*, 560 U.S. 605, 608 (2010) (sentencing court retains power to order restitution even after the 90-day deadline when court makes clear that restitution will be ordered but has not calculated the exact amount); *United States v. Gushlak*, 728 F.3d 184, 191-92 (2d Cir. 2013) (same). In any event, the Government expects that a representative of MCU will be present for and would like to address the Court at sentencing, which request the Government believes is appropriate.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial term of imprisonment, and a substantial fine, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
      April 15, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    s/ Eli J. Mark
       Eli J. Mark
       Daniel C.  Richenthal
       Jonathan E. Rebold
       Assistant United States Attorneys
       (212) 637-2431/2109/2512
       Alona Katz
       Special Assistant United States Attorney